Hear ye, hear ye, hear ye. This honorable appellate court of the 2nd Judicial District is now back in session pursuant to adjournment. The Honorable Susan T. Hutchinson, presiding. Please be seated. I'm very pleased to be in the office of the people of 2-0-18-4-0-0-7, the people of the state of Illinois, once again. Jose Garcia, Defendant of the Council, Pardon me, Mr. Counsel, Defendant of the Council, Mr. Paul T. Glazer, Pardon me, Honorable appellate, Attorney at the moment, termed as Joe M. Griffin. Mr. Glazer. Good morning, Your Honor, counsel, and may it please the court. Jose Garcia appeals his conviction and sentence of 62 years for the offense of first-degree murder. We've raised two issues in our brief, and I'd like to focus my remarks this morning on issue number one regarding the involuntary custodial confession. Notwithstanding Illinois' recent questionable history about wrongful convictions, a number of which were based on custodial confessions, police still have some leeway in interrogating suspects. They can team up and question a suspect two to one. They can do the questioning in a windowless room. They can deny the suspect contact with family and friends. They can overstate or understate the amount of evidence they have in talking to the defendant. But there are limits. At the very least, they cannot overcome a suspect's free will at the time of the confession. I would tell that by looking at the totality of the circumstances. What if the witness or the person being interrogated is not new to the system and can ask reasonable questions related to, well, how do you know that, and things that indicate that he or she knows something about this process? Experience is a factor, along with age, education, duration of the interrogation, physical and mental abuse. My client had experienced questioning before in custodial situations, but never in those situations previously, which were of way minor impact. There was a graffiti, a vandalism, a class A misdemeanor. In none of those instances was he lied to by the officers or the people questioning him. So his experience was a lot different this time than it was that time. My client was 18, not well educated, a special ed student from the get-go. He was questioned in custody before, as I said before, but never lied to. He was taken into custody in this case by the Lake County Major Crimes Task Force on the night of March 10. He was questioned for about an hour and said nothing. In fact, one officer claimed after a half an hour he was so fed up he yelled at my client, said thinking he was, quote, cocky and carefree. Despite trying a number of schemes or themes, the police never got a word out of my client and I have an admission to being present at the scene of the shooting. Before resuming the interrogation the following afternoon, the officers talked to a Mundelein police officer who told them that Jose Garcia had very strong close family ties. So the detectives figured this is a way, we'll try this tactic, we'll make up some stories about some harm to his family, we'll lie to them and see if they'll get him to talk. So within 15 minutes of starting the second interrogation, the police began a 45-minute series of admittedly false allegations about threats or physical harm to my client's family coming from the Latin Kings. I only had about 15 minutes this morning, less now, to address the court this morning, so I can't repeat all these lies in full part. But what ultimately did the trick for the police in this case, after telling my client that his brother could be a Latin King shooting victim, that his family's home Mundelein could be the victim of a firebombing just like the last one a couple years ago, his mother could have been. But he even admitted to, pardon me for interrupting there, but he even admitted that he knew of another incident involving gangs where there was retribution. He was knowledgeable about the reality of that happening. He was certainly knowledgeable about how gangs can operate, but there was no information, there was no truth to any of the allegations that the police purported to my client that his own family had been specifically targeted by the Latin Kings as a result of this case here. The police admitted it was a lie. He said they could be targeted. Yeah. How could they be targeted? Well, he also said that the police, he says, you think I'm effing lying to you? The police are now going around your family's house in Mundelein right now because they're fearing retaliation. Absolute lie. That's not true. But they were patrolling the house. They patrol everywhere. The police do. Well, I think, doesn't the record reflect that they were patrolling because of this incident that had happened? I think the testimony was that there was some discussion of whether to set up more patrols because of the fear of retribution, but there were no specific threats. The detective told my client, the Internet, Facebook is exploding with all these stories about the shooting. And we need you to tell us what happened so that the misstatements don't get out there and come back and hurt your family. How is that a lie? Because there were no misstatements. There were no reports to Crimestoppers. There were no people calling Crimestoppers to get money to turn this guy in. All this was a lie. We don't have to infer. We don't have to assume. The police officers testifying, it was all a lie. Now, the final trick that did this whole thing in and did the trick for the police was when Detective Seeley said, we can only protect you so much, but if you tell us it was an accident, we'll make sure it gets on the street and it'll all be over and your family will be safe. You don't have to lie in bed at night and worry about what happened to your mother, your father, or your sister. This is, if you tell us you did it, that it was an accident, we can protect you from these false lies. Within 20 seconds after that appeal, the defendant finally broke down and told the police exactly what they wanted to know. Yeah, I shot him. It was an accident. Now, the state says the police are just advising the defendant about the realities of gang violence, but there's no reality here if the police admit they were lying. The starting point in examining a confession shouldn't be, oh, the police can lie. It's acceptable. Police lies are a factor, like any other, which must be accounted for in determining a statement's voluntariness. But when it shows the defendant's will was overboard and we have not given the statement, we're not for the deceptions, it's not a voluntary statement, and we have videos here showing that was the case here. Before the lies, my client sat stone-faced, cocky and carefree, might be overstating him a little bit, but he's clearly not interested in giving the police any information. Even when told we have a video of you at the scene and witnesses, he still remained silent and didn't admit a thing. Only when the police offered to quash these Latin King threats against the family, the defendant suddenly broke down and talked. But didn't he even say, I heard by someone that the rumors spread out that he had died? That's the defendant's own words. He's aware of rumors at this point. But that's not a threat to his family. It's a rumor about what may have happened at the scene. It's not a threat to his family. Lying to suspects is wrong, not only morally, but from a perspective of reliability. There's a distinction between police lies, and there are some cases in our brief, the state cites it, where police have misled the suspect during interrogation. There's a distinction between police lies about the evidence they have and lies about extraneous matters. For example, if the police tell a suspect, you know, we got your DNA, or we got our witness who will identify you, or your co-defendant's already talking about it against you, even an innocent person in that situation would still want to give some explanation. Well, I might have been there a week before. That wasn't me. You got the wrong guy. You know, I didn't do it. You can still offer some reasonable explanation and still be a voluntary speaker to the police. But if the police tell a person that people are going to kill your family if you don't confess, even an innocent person, a truly innocent person, would have a reason to confess, even if they didn't do it for fear of what might happen to their family. There's no functional difference between the police relaying false threats to others and the police threatening the defendant in person. So it's okay to lie about what happened, for the police to lie about what happened during the alleged offense as opposed to extrinsic issues. That's what cases seem to say, yes. But now, aren't the Bowman case and the Travis case that you cite distinguishable? No. In fact, Travis is very close. Travis is a 15-year-old defendant who was questioned and told that if you talk to us, if you confess, we can keep the case in juvenile court. That was not related to the facts of the case. It was an extraneous matter. And the court, of all the issues that raised the case, found that to be the major stumbling point to affirming the conviction. The bottom line there is telling the kid it's going to stay in juvenile court so no matter what you've done and how bad it is, it's over when you turn 18. Yeah, I said, well, it'll be over when you turn 17 and everyone starts fresh, I think was the comment. Right. Which was not true. It's a lie about an extraneous matter. It's probably more connected to the offense, because it does relate to the prosecution somehow, than what happened here. When he says your family's going to get fired on when there are threats, that's not the truth. It's a lie. You can't condone something like that here. Lying only serves to give an innocent suspect a reason to confess and it's wholly unrelated to the truth or falsity of what they're confessing to. The denial of suppression motion here was wrong. The conviction should be reversed because of that confession and the case should be remanded for a new trial. Or the alternative, Mr. Garcia asked his court to reduce the sentence 10 years because the evidence as far as his being the personal fire of the weapon that caused the death here was not proof beyond a reasonable doubt. Thank you, Your Honor. Ms. Kripke. May it please the Court, John Kripke on behalf of the people of the State of Illinois Council. I disagree with many of the arguments the defendant put forth here. But the first thing I wanted to respond to was to my footnote one in which the defendant, and again the defendant brought this up, he said, well, this boy was a special ed student. And my response to that was, there was nothing in the record until there was something in the PSI and the defendant says that it was in the PSI and they responded to my argument saying, well, you can use anything in the record. That's not correct. You can use anything in the record, but it has to relate back to evidence that was presented to the trial court. You can't make new arguments on appeal. And I would just refer the Court to People v. Murdoch, 2012, Illinois 112-362, paragraphs 36 and 37, that say very specifically that you just can't bring in something else. Maybe if someone had spoken about this boy at the motion to suppress and then they came back and bolstered it with more information from the PSA, that's a different thing. But you can't ask the Court to overturn the motion to suppress based on evidence that was never before the Court. So that's number one. Number two, I put this in the brief at the very beginning and strongly urge the Court to watch the videos. If you don't watch the first one where the defendant really does not respond, but what is important about it is the way the defendant sat there, his posture, his demeanor, his snickering at the police officers, looking at the wall, and he put forth what we know is to be a complete lie for that entire hour and, I think, 12 minutes that he was interrogated. Is it clear from the video or otherwise that he actually understood what was being asked of him? Absolutely, because he went through with a very long, elaborate lie about where he actually was. I was with my brother in Waukegan. He described the white car that his brother's girlfriend had driven. There had been a party at his parents' house for his niece's birthday. They then went up to Waukegan and they just chilled out. There were all these other people coming in, coming out. He changed his clothes up there, and then he was brought back Sunday morning at some point to his parents' home. I mean, he told that lie the entire time, and they finally said, Look, we're not asking you questions because we don't know the answers. We know this isn't true, and he would not change. Finally, at one point, they said, We have a video of you at this store in Round Lake, and he said, Oh, yeah, you have a video. Can I see the video? They said, Yeah, we'll show you the video. But they didn't show him the video until the second day. But again, and I'm sorry I didn't take how long the first half of the video went until they finally showed him the video. But if you're going to kind of guesstimate based on the number of pages, it was probably half into the hour-and-a-half interview. Then they showed him the video, and he realized. They said, Look, this is you. We have people identifying you. And he still proceeded to give them the lie. He proceeded to ignore them, and you have to watch the video of the interview. After he himself is shown the video from the store. He is slumped down in his chair. He's kind of looking around. If you just read it, it looks like ba-boom, ba-boom, ba-boom. They're just peckering him with all these different comments. But there's huge gaps of time when they're trying to get this young man to respond to them, and he doesn't. And so they were trying. Did they absolutely come out and say, We have absolute threats, and we know this is going to happen to your parents? Never. Was it true that the chief police in Mundelein called one of the two detectives who was on the task force, one of the two men who were interviewing him, who was a Mundelein detective, and he said, Look, do we need to put somebody on this home? And they told this boy that. They said the police chief called. And he said, Oh, yeah, and he even knew the man's name. And then they had this long discussion about the firebombing in Mundelein. And he got very animated. That was terrible. This young boy was killed. He knew all of that. So did they say other things? Justice Hutchinson, you're correct that the defendant said, Well, I heard he had died. So clearly there were rumors flying around. There's nothing in the record to – the record does not say how many rumors. It doesn't say if there were rumors or there weren't rumors going around. I don't know if these detectives ever checked. But there's also no case law that says you can't lie to the defendant about what the defense is referring to as extraneous issues. You can only lie about factual issues. No wonder they say you can't lie about extraneous issues. For example, in that Travis case, they lied about something that was clearly something that would influence someone's decision if they have the savvy to know that being in juvenile court is certainly going to be a better way to proceed than being in adult court. And so maybe that did scare this young man. But this boy was very flip. Hey, just take me to St. Charles where I can hang out with my buddies. And they said to him, No, no, you're going to big boy court. They told him right from the beginning that he was going to end up – and they said, And you know what? You're probably never going home. And they told him that from the beginning. They laid that out to him. And if anything was preying on his mind, maybe it was the fact that – Talk to us. Tell us what happened. Perhaps you can get a better deal because there are other people out there talking. Whether there were or there weren't, they're allowed to say that. So when does it become just over the line to draw in family or your nieces, your nephews, you just were with your whole family? We don't know. He might have had his own young child living in that house. There was no evidence to that. But when does it cross the line to get the family who – they have absolutely no information that they're involved in this in any way. So when does it cross the line? Well, we don't know what the family did and did not know. There's nothing of record. The point is when is the police conduct over the line? I don't find this to be over the line. The question is when. I don't think you can draw a bright line and say, Oh, they made one step too – but why should it be over the line to say to these young men, they know that he's close to his family, and to say to them retribution in gang interaction, why – that's known. I mean, we all know that from reading all these transcripts in these various cases and the Mundelein bombing. It was definitely a retribution. It was the same gang members. It was a guy who was trying to retire from his gang or extricate himself from it. And he was well aware of that. And he also kind of, at the end, when he said, Well, yes, you know, they showed him the video, it was clear that they were involved, and he knew that this young man had died because they were telling him this. And he had also heard these rumors. He's trying to pass it off as, Well, he said this to me first, so we're allowed to retaliate. I mean, it was the culture that he was involved in. If he didn't want – and so you're asking again, when does it not involve the family? Well, he's living with his family. He's living with his family. Why – you know, he's putting his family in danger just by living in their home. So that's a responsibility on him. What is his gang? Do we have a specific gang affiliation for him? He's a Latin king. Well, then why would the Latin kings be out after him? Because what their reasoning was, if I can follow it, of the police officers were, this was not an officially sanctioned killing by the Latin kings. And now there's talk out there that this was a Latin king killing, and now you're pulling the other Latin kings into something that you were freelancing on, and they're not going – they don't want that. They don't want to be involved in something that they didn't officially sanction. So now they're going to get back at you by going after your family. Well, why don't you talk about then a gang war that's going to happen, and if your family happens to be out on the street during one of those episodes, they could be hurt rather than the Latin kings are going to come and blow up your house. But they didn't say that. They said it could happen, and it was true, that the police chief said, should I be putting more protection on his parents' home? And the response of the officer who worked in Mundelein said, may not be a bad idea. Because he doesn't want more problems, but that doesn't mean it's going to happen. He's looking out for the – But it already did happen in Mundelein. They already had that problem. A terrible – a fire bombing. So why shouldn't they prepare? I mean, and if the police officer – if the police chief didn't put out protection, then you have the public saying, well, you know, they had precedence for this. It was the same Latin kings. Why didn't they do it? Or maybe it was the Mundelein Latin kings. I can't keep it straight. But regardless, they had knowledge that this type of thing happens, that they seek retribution in this case. And by – look, I can point to the Dallas case that went on in Kane County. Same thing. Why was that 6-year-old little boy shot and killed while sleeping at his grandparents? Because the gang knew that his uncle, who was a gangbanger, lived in that house and slept at – having to sleep in the room in which that little boy was now – his uncle wasn't there. He was in his uncle's bed. So this isn't just something that's being pulled out of the air. It's done all the time. And it was well known to them. And the defendant – if you watch the video of the interview and you look at it with the transcript, at one point the defendant says – and first of all, also, giving – showing him the video, the court – I think it's the Miller case – says, you're giving the defendant more information. He's able to make a better informed decision about whether or not he should confess or not. And so he knew that right then and there they had him, at least for the murder, because he was there and they knew that. But the discussion about the retaliation among the line took place on pages 20 to 22. And then on 23 he says, you know, I just hate being in situations, man, as if he's trying to decide between which college to go to or something like that. God, you know, do I take this one or that one? He's got this dilemma for him. And it wasn't until – and then finally on page 29 they said – the defendant says, like, he knows he's going to county. He knows he's going to, as they put it, big boy jail. And it wasn't until pages 31 and 32 that he actually confesses to them. And he never waived Miranda. He never invoked his right to counsel. It's not like the case in Bowman where they told this guy this elaborate story where a deputy and a former cell mate and the defendant had already invoked his right to counsel and they really preyed on his fear of going back to Menard. So that's not – this is not the same type of case. And also the defendant referred to the – Well, let me just ask, for me, an obvious question. What's the difference between the fear of going back to Menard and the fear of having your family killed? Why is one a problem and the other isn't? Because in the Bowman case it was the way in which – it was this incredible deceit that was put together and the deputy involved a former cell mate. I mean, the whole thing was – the facts were really, really intricate. I kind of tried to make it more concise in my brief. But if you read Bowman, it just goes – the facts were just unbelievable. All they're saying here is, you know, there was this bombing. We worked the bombing. And he's like, oh, yeah, you worked the bombing. I know about that bombing. That was a terrible bombing. This little boy died. And they said, yeah, it was terrible. It was retaliation on the family, in the home in which this guy lived. And why is this any different? You've now involved – The guy was there then. This guy isn't going to be there. I mean, they're going to get him for something. He stayed in jail. But let's say that the guy – but I take you back to the Downs case. The guy they were trying to retaliate against wasn't there. But his nephew was there. He wasn't in jail or prison, was he? He just didn't happen to be home for the day. Okay. And neither was the guy in Downs. But this guy's going to be in jail. But what is the difference? He has exposed his family to it. And so is it – but what are you saying? Is it only it's okay if they do the bombing if the guy's there and he dies? I'm not saying it's okay. But why would they go after Mr. Garcia's house if they know where he is and he isn't there? Because he had involved the Latin Kings. He had done this killing of this guy without sanctions. And that's against their rules. And you're not allowed to do that. Would you like me to address the other question at all? We're fine. Thank you. Okay. Thank you. So we ask you to affirm the ruling – the conviction and the judgment. Thank you. Thank you. Your Honor, so I just – comments kind of in the same order that counsel approached them as far – again, the State objects to our citation of the pre-sentence report saying it wasn't part of the record. The Alfaro case says you can look at the whole record. That's how I read Alfaro. And I think you'll read it the same way too. I believe that if my client had said at his sentencing hearing, you know, I admit I did it, I shot the guy, I'm guilty, I hope I don't get too much time, that would pretty much underdo any issue that could possibly raise a challenging sufficiency of the evidence. So certainly what's at the pre-sentence report in the sentencing hearing can be considered. We didn't write the pre-sentence report. The State wrote the pre-sentence report. If we can't rely on the liability of the pre-sentence report, we've got problems. Now – But if the judge doesn't know it at the time, he makes a decision that the defendant's will was or wasn't overborne and now finds out months later that maybe he doesn't have the capacity, how does that work? Well, because you're conducting de novo review. But even – okay, putting the whole education point aside, as the State says, look at the video. He is not the most articulate young man you'll want to find and certainly is one who is subject to or suspect to improper suggestions on the part of the police. And, Justice Garza, you mentioned the Travis case. Let me refer this court to Paragraph 66 of Travis where they cite a Kellerman case that says, to constitute an offer of leniency that renders a confession inadmissible, a police statement must be coupled with a suggestion of a specific benefit that will follow if the defendant confesses. Here's an example of one. If you want to tell us your version of this, this was an accident and this was on you and this was nothing else, I'll be more than happy to put that out there and we'll make sure we get the officers who can get it in the street. It's done, it's quashed, it's over. You'll know your family's safe. You'll know that you don't have to worry about anything and your family because you took responsibility for it. That's exactly what Seeley said to him and it was a lie. Seeley admitted that contrary to what he told the defendant, there were no rumors about gang retaliation against the defendant following the shooting. It's page 323. He didn't know whether there were any threats against the defendant's family, 327. The police had no knowledge about anything about the shooting being posted on Facebook. Detective Gauguin admitted they lied to the defendant about that. The police always call their gang expert to testify in trial. Well, this gang expert testified that he was not aware of any specific threats after the shooting that caused an increase in patrols around the house of the defendant's family or any threats on Facebook. And if you didn't know the thing about the police, Gauguin said, I'll give you one that tells my client, Chief Mullen, I'll tell you the task force to ask us if he needed to start assigning extra officers, start watching down in your apartment where your parents live because they're worried about retaliation. Who's they? I would guess my client, who I can't say how educated he is, but could interpret the they as the parents are worried about retaliation. Those are lies. You can't do it. Draw the line here. Is this the case? Are you actually arguing bringing in the family is the bad part? Or are you arguing that the lie was so extensive that it's a problem? Both. Both are right. I think it's the extensiveness of the lies, plural, and the fact that they are threatening the defendant's family, just as if they held a gun to his head and said, those kings are going to shoot you as soon as he lets you out of this building. You better confess or we're letting you out. That may well have been true. But does that mean they're going to shoot his family? Well, that's even worse. I mean, I think a lie is a lie is a lie. And when it doesn't pertain to the evidence, of course, again, give the police some leeway. But this goes way beyond what was appropriate. I think you have to draw the line here. If I can summarize it again, as Travis concluded in paragraph 75, Travis wrote a case where a 15-year-old kid shot and killed an ice cream vendor on the street. Horrible case. And they said, we understand that this case presents extremely tragic circumstances. However, as we are a nation of laws, we are compelled under the law to reverse the circuit court's judgment and remand for new trial, which the interview in question here is to be suppressed. That should be our watchword here. We're a nation of laws. The police have to follow laws like everybody else that can't lie to someone and say, confess and your family's dying. That's not proper. Thank you. Mr. Blazer, is this your last oral argument, possibly? It depends on what your hours have scheduled this summer. I suspect it might be. And is this, did you hit your 1,000 mark? Oh, I walked my 1,000. This is my 140th argument. Well, if we don't see you again, good luck in your retirement. I'll be in the room. And good luck in whatever you choose to do in the future. Thank you, Your Honor. It's been a great pleasure. Thank you very much. Good luck to you. Thank you, counsel, for your arguments. We will issue a decision in due course. We're going to recess to prepare for our next decision.